Next case is Gill v. Winn-Dixie Stores. Good morning, may it please the court. My name is Susan Warner. I'm here on behalf of Appellant Winn-Dixie Stores, Inc. With me is Sandy Grimm, General Counsel for the appellant. This case is about the applicability of Title III of the American with Disabilities Act to Internet websites. The facts and the law of this case has been well briefed, and I stand by our briefs and those of the DMECA's counsel that were submitted in support of the appellant's position. Today I'd like to focus on three main issues or main points. First, websites are not places of public accommodation under Title III of the ADA. Second, WCAG 2.0 is not the law of the land, and its adoption by the trial court was a violation of due process. And three, Winn-Dixie is in compliance with the ADA because Mr. Gill was not denied equal access to and the full benefit of the goods and services of the Winn-Dixie Stores. Now to the first point, websites are not places of public accommodation under the ADA. The Eleventh Circuit precedent on this is crystal clear. In Rendon, this court said affirmatively places of public accommodation can only be physical locations. And I don't understand that to be Mr. Gill's argument. His argument is your third point, that he was denied the benefit of goods and services of Winn-Dixie Stores. In that, under the Rendon theory, I think they're trying to go under the Rendon theory, which is this nexus theory of the intangible barrier. And I believe that Mr. Gill and the trial court misinterpreted that nexus theory as laid out in Rendon. To quickly go through the factual basis of the Rendon case, in that case, it was a game show and the game show was in a physical location. That physical studio was the place of public accommodation. The only way people could become contestants on the game show was through a telephone call-in That case, who I believe were hearing impaired, said that the telephone line was not giving them access to the television studio because they couldn't get through on the telephone line. Therefore, they couldn't even get in line to become a contestant on the game show. As I read the Rendon case, the plaintiffs were not arguing that they were denied entry into the studio. They were arguing that they were denied the benefit of being able to be a contestant on the show. Which could only happen if they entered the studio. I think in Rendon, what the case law is saying is that you can have an intangible barrier. The telephone line became this intangible barrier. The analogy would be as if it was a ramp. The ramp to the studio was missing and so therefore they couldn't physically get into the studio. But Rendon did not say the telephone line itself becomes the place of public accommodation. In fact, I agree with you. It was the access to the goods and services, not goods, but to the services associated with the television show. Correct. I agree with that. I think what Rendon lays out is there can be intangible barriers. I don't think we wouldn't disagree that there can be a screening process, something intangible that would prevent the person from accessing the place of physical accommodation and the goods and services in that place of public accommodation. But they still have to be tied to the physical location. In this case, Mr. Gill... I have just one more question about Rendon. What if instead of a telephone system, the show had used a website that was inaccessible to people with visual impairments? Do you think the court would have reached the same result? I think they could have. If the only way that someone could access becoming a contestant or to get into the physical location of the place to avail themselves of the privilege, then yes, I think that could have stated a claim. But that... Where in Rendon does the court refer to physical access to the location? They talk about... I'm not sure if I can give you a pinpoint site, but they talk about the privilege of competing in the game show is in the studio. They talk about you have to come to the studio. I'm paraphrasing. But the privilege of competing in the game show happens once you get to the game show studio. So the studio is the place of public accommodation. And in that case, the screening method... And I think they used language, I believe, that talked about it being a screening method under those provisions of the statute and the regulations that essentially this telephone line became a way of screening inadvertently, was screening out people with disabilities because it wasn't accessible to them in its current format. What the television studio had alleged below is like, well, the telephone line is not a place of public accommodation and therefore it doesn't apply to us. And so the court said, well, yes, you're right. The telephone line itself is not a place of public accommodation. But it is acting as a screening process, as an intangible barrier to disabled people getting to and availing themselves of the services of the place of public accommodation, which are competing in the physical space. In this case, to go back to the facts of this case, Mr. Gill did not allege that the website was blocking him from access to the goods and services of the store, which are only found in the Winn-Dixie stores. Winn-Dixie does not make any sales on its website. It does not conclude... There are no transactions. Anything, any information that is on the website is merely duplicative of what is available in the store. And for any customer to avail themselves of the goods and services of Winn-Dixie, they have to go to the physical store. And Mr. Gill alleged in his complaint, and it was borne out at trial, that he was a 16-year customer of Winn-Dixie, where he bought groceries, he filled prescriptions, he used coupons. He did everything that he's now complaining that he does not have access to on the website. But he did not allege in his complaint, nor did he prove, that the website was blocking him from accessing the services in the physical store. He has full access. And I think that's what Rendon stands for. There could be a situation where there would be an intangible barrier, perhaps even a website, that would be blocking someone's access to the services of the place of public accommodation in that physical place. Aren't the facts of this case very similar to the Haines case, which granted was an unpublished opinion, but there, the plaintiffs alleged that they were unable to access all of the full services of the Dunkin' Donuts store, but they still had to go into the store to make a purchase. I disagree, because in that case, the court said that they reversed on the finding that the plaintiff had alleged that the website was a service, and that the services are covered under the ADA and have to be accessible. In this case, Mr. Gill did not allege that the website was a service. That's not what was litigated. That's not what was tried before the court in the bench trial. The question in this case is, is the website in and of itself a place of public accommodation? And they kind of put forth two theories to that end, one being that the website is just a place of public accommodation, generally under the ADA, which we disagree with. Websites are not mentioned anywhere in the statute and the regulations. And their alternative theory is under this nexus theory of Rendon, where by alleging, and as I've just stated, I don't think Rendon stands for that proposition, that it could be an intangible barrier, but the barrier itself does not become the place of public accommodation. Because he only alleged that he can't get access to the website, not that he can't get access to the store. And the store is where all the goods and services are of Winn-Dixie, not on the website. What happens in a situation where, let's presume this website was completely duplicative of the store experience? That you could order groceries, that you could fill and have prescriptions delivered. How does that, how would that change the analysis? I actually don't think it would change the analysis. I think it would be the same way, because the goods and services are still available in the store. The ADA regulations say that you have to have equal access, but obviously when you're dealing with disabled people, the manner in which you get to the goods and services are going to have to be different. I mean, I'll go back to a physical concrete example, which would be someone who is in a wheelchair. Their physical access to the store is going to have to be a ramp. They can't take the stairs, but they're both getting to the end point. Even under the Department of Justice's advanced notice of proposed rulemaking that they made back in 2010, they put in there that just because you have a website, if you have a business that had an alternative method of providing the exact same service with the same benefit, that would be okay. Their example was, if you have a service on the website where you have 24-7 access to your online bank accounts, if they proposed that perhaps a bank or the department store or whoever had the account could set up a 24-7 telephone number where someone could call in and get the same information. So I think even in the example, even if they could sell groceries, as long as you can get the same services, and the service is the grocery, right? The service, the good is the grocery, the prescriptions which are available in the stores, and as long as there are equal access to the end product, I think it doesn't change the calculation at all. And you mentioned the Department of Justice. This was an advanced notice of proposed rulemaking, so not even a proposed notice of rulemaking, and certainly not a final notice of rulemaking. Correct. And the department, in fact, has withdrawn that at the end of last year. There is no regulation, there are no standards, which is why I went to my second point, which is WCAG 2.0 is not the law of the land. It's a voluntary guideline that's ever-changing. It was just updated back in June, and it's common knowledge that it's going to be updated again in the future. It gets to your due process argument. I know you're just about out of time for your initial argument, but I would like for you to address at some point whether you raise the due process argument before the district court, because it does appear that this is a moving standard, a moving target. Yeah. I believe we raised the due process argument, perhaps not as articulated as I would like to if I could go back in time, but the concept of not having fair notice to the standards under the judge entering an injunction and saying 2.0 is the standard, that is the trial court creating a standard and legislating from the bench. It's not the court's job to step in if Congress and DOJ have failed to act. Websites are not mentioned in the statute or anywhere in the regulations. There's been no regulations proposed. We're not here today to say that that can't happen, and perhaps it should happen. It probably would give a lot of certainty to businesses across the country so that they would know what they're supposed to be doing, but they haven't done that. Where there's a void, the court should not be stepping in to do that, because then you can have different decisions in different courts. Whether or not your website is going to have to follow WCAG 2.0 or another standard might depend on which judge you get, and therefore there's no fair notice, due process notice, to not just Winn-Dixie, but to the entire country as to what standards you might have to apply. I think I'd like to save the rest of my time for rebuttal. Because you were answering our questions, you may have your full time for rebuttal. You may begin when you're ready. Oh. Thank you. Thank you. Good morning. My name is David Furlager, Counsel for Juan Gill, and I'm here with Josh Enten, co-counsel, and Scott Dinnan, co-counsel. Winn-Dixie's website is, I think the other side concedes, is the portal, the gateway in the district court's word, to a service of its stores and pharmacy. It was not accessible to Mr. Gill, and he sought to use the website to access the store's pharmacies and things like in-store coupons, other in-store services, delivery of medication. There are some things that are only available on the website, such as the application of coupons to one's, they call it the Plenty Rewards account. In-store, you cannot apply coupons to the reward account? That's correct. So the case was litigated on the theory, and the complaint is inclusive of the theory, that the website is a service, services used in the ADA, of Winn-Dixie. The complaint, paragraph one of the complaint, very first paragraph, the introductory paragraph, says the website is an extension of its grocery stores. Paragraphs four and five say that Winn-Dixie offers an adjunct website, which is directly connected to the stores, and it's a true nexus in the words of paragraph five. Paragraph eight of the complaint says that the case is to prevent discrimination on access to the website for services in order to order medication. Paragraph 19, the website services the stores. Paragraph 20, the website is an extension with a direct nexus to the stores. There's no doubt that the nexus theory on which the district court based its decision is part and parcel of this case. In this particular case, you had expert testimony that you'd offered from an individual who indicated that this WCAG 2.0 should be the standard, but that as far as he was concerned, that he'd never looked at a website that had complied with the standard, that could comply with the standard. So, has this district court not only engrafted a standard, it's not recognized in the law, he's found a standard that's ever-changing that no one can ever comply with, and I would assume that if Winn-Dixie attempted to comply, they would be in violation of the order, according to your expert's theory. Winn-Dixie itself had no expert testimony at all, and the judge had in front of him testimony on both sides really, that WCAG is a standard. It's actually a guideline more than a standard. What happens when we have WCAG 2.5? What does Winn-Dixie to do with that? It has a standard that the court has adopted, it's 2.0, we have a new standard, should it comply with 2.0, 2.5, what should it do? The WCAG standards guidelines are not like how many inches one goes from here to there. They set up certain qualities of a website that need to be complied with. Websites can't exist without having these qualities, so the issue in front of us is not WCAG and whether or not one can avoid difficulty with compliance, because the testimony was, and this is maybe more to your point, Judge Reeves, the testimony was that Winn-Dixie was already working on WCAG. That's the standard that the federal government uses, everyone uses. My question is more than that. It goes to the standard of compliance. Kirog, I think, was your expert who testified that he had never tested a website and found that it met all of the WCAG standards. So he's never tested a website that met all the standards, but he's imposed this standard on a company, and if the company doesn't comply, it will be in violation of an injunction, and it looks like that there's no way to comply. What am I missing on that? Government stores, everyone who has websites has no difficulty with working with the guidelines. It's the industry standard, the government standard, it's not an issue for anyone, and the development of WCAG 2.1, for example, is where we're up to now, 2.2, 2.5, those developments have always, and there's no reason it would change, not rejected compliance with the earlier guidelines. To the extent that's a due process argument, to go to your earlier question, that was not only not raised below, there's no place, I believe, that WMDC can cite to erasing the due process argument at all, and it was certainly not decided by the lower court. That was not an issue in the case until this appeal was brought as a new issue, constitutional issue, which I believe the court doesn't consider when it's newly raised. You mentioned that this is a government standard, but as we were just discussing, your opposing counsel, there is no Department of Justice regulation on this topic. It does not set these guidelines as the standard. While there may be people using these standards, it's certainly voluntary compliance only. How do you get to the point of calling it a government standard when, in fact, there is no final rule on this? The lower court didn't deal at all with any regulation or the absence of any regulation, and that's not at all pertinent, and I think your question recognizes it, to the liability question. It goes only to the remedy issue. How do you remedy the violation? And I call WCAG a guideline, not a standard, but there's no need for a rule, a standard, whatever you want to call it, with regard to compliance, because here, WMDC had no issue until they made it an issue on the appeal with compliance with the WCAG standard or guideline, because that is the reason it's a guideline, and the reason it's accepted is there's nothing else out there. It's the industry, government, university, academic research guideline that is universally accepted, and if they had come up at trial, there's no testimony about this from them, that there was a problem with that guideline, then the lower court could have dealt with it. Lower court didn't deal with it because it was understood by everyone that that is the guideline that they would follow, because they have no alternative. They didn't offer any alternative, but in any event... How do you know you're in violation? That's the question. If there's nothing else out there, quoting you, there's nothing else out there, how does a company ever know it's in violation if it doesn't know what the standard is? Because, you know, I'm thinking of how we know when there's a reasonable accommodation. There's no standard for reasonable accommodation. There's the most general guidelines for what undue burden means. In the law, there's a lot of situations where we don't have defined guidelines that are set in stone. So the WCAG guidelines look to things like, can it be read by people who use different kinds of access tools for websites? Can it be a robust website that is one that is usable by people with different needs? So it's not the kind of prescriptive guidelines. So when one uses those standards, those guidelines, one analyzes whether it meets the goals and the solutions to issues that WCAG does. And I think one could substitute those principles on which WCAG is built in that paragraph in the court's order and come up with the same result. When Dixie Wood, as it is now, working through that assumption that WCAG is what they'll use. But that has nothing to do, in my opinion, Your Honor, with whether or not there was liability for violating the ADA. But you said we don't know what reasonable accommodation is, so we go through the lawsuit process to determine that. But here we have a court order saying you have to comply. If we had a court order saying you have to make a reasonable accommodation, I think we could all agree that that's not specific enough. How does anybody know how to comply with that? But here, this is a court order. How would Winn-Dixie, yes, it does not go to liability, it goes to remedy, but it's still a valid point today. How in the world does Winn-Dixie begin to comply with a guideline that could be shifting tomorrow? And in which case one would have in order, taking your suggestion as a possibility, one would have an order that said you shall have an accessible website. And that would result not in any change in the liability finding, but in a change in that phrase in the court order that says WCAG was substitution of the word accessible for the website. And our argument on the website is a statutory argument. It's based on several sections of the statute, because Title III, as you know, Your Honors, doesn't limit what aspects of a place of public accommodation have to be accessible. It requires that there be full and equal enjoyment of the goods, services, facilities, privileges, et cetera. The website is one of those facilities, services, advantages of the website. Another section of the ADA, the next one, is about denial of participation. It's illegal to deny a disabled person an equal opportunity to participate in a benefit, goods, services, et cetera. So when everyone else can do things on a website, everyone meaning sighted persons, if a blind person can't, that's a denial under that statute of the equal opportunity. How do you deal with the Rendon case for the 11th Circuit, which, as your opposing counsel has argued, the website in this case does not provide a barrier to the physical store in any way? Well, it denies someone the ability to equally participate in the website. It denies someone an equal benefit, another section of the statute of the website, and it fails to modify the policies of Winn-Dixie to make the website accessible. Rendon said the ADA goes beyond, as we all know, just physical barriers to access. In this case, the lower court, there's no case that says in this district that the issue is whether or not you can walk into the store. The issue is how does one equally benefit with everyone else from the service that the company, Winn-Dixie, provides through its website? And if you or I, who can see, can have medication delivered to us, if we can get our coupons applied, if we can do all the things that we can do through the website, a blind person under the ADA has to be able to do that. And I think the per curiam opinion in the Haynes case interpreting Rendon says that as well. Uh, you can't have a service that keeps blind people out. Uh, Winn-Dixie website, the portal, the gateway, whatever you want to call it, to the store is locked to the person who's blind. Are you therefore arguing that the website is a public accommodation? No, I'm arguing that in the words repeated over and over again in the statute, it's a service, an advantage, a benefit, uh, it lists a list of nouns Congress wrote of the public accommodation. This case is not, as the lower court said, this case is not about whether a website in general is a public accommodation. I know my colleague argues over and over again, what the lower court did not decide, argues that, uh, websites are not in general public accommodations. This case is about what the statute is about, which is a service, a benefit, an advantage of a public accommodation. Can Winn-Dixie shut down the website? Yes, Winn-Dixie has no obligation to have one. They can shut it down. There's no question about that. They could shut down the prescription piece and then the coupon piece. They could still have a website if they removed those, then there would be no difference between the store and the website. Not exactly because the website has to be accessible to blind people. It's not a barrier to the store if it's not, is it? No, but the ADA does not look at it that way. The ADA looks at whether or not the service, which is the website, is accessible to the blind. So if you and I can use the website in a certain way, a blind person needs to be able to use it in a certain way. WCAG or no WCAG. So I want to turn to how the 11th Circuit looks at this. We have Rendon here in our circuit, and as you know, there are other circuits that look at it differently. A couple circuits, the 1st and the 7th, say that all websites have to be accessible. As I told you, I don't think that's at all the situation in the 11th Circuit. There are a couple other circuits which say the only thing covered by the ADA are physical spaces, and that I think is maybe the position of my colleague. Our circuit takes a moderate position, whether you call it Rendon, whether you call it Haines. We need to have the portal, the gateway, the connection to the physical place. You need to conclude your remarks, Mr. Ferliger. I appreciate that. So let me conclude with what this case is not about. This appeal does not argue any abuse of discretion. That goes partly to the WCAG argument, the fact that due process wasn't raised. This case does not argue clear error in any of the fact findings of the lower court. This case does not argue, and it is the defendant's burden in this kind of case, to argue the fundamental alteration, the undue burden, etc. And with regard to the complaint only about the relief, this case does not raise the due process issue for decision here. Thank you. Just to start, I want to make a quick factual clarification about the coupons. Customers can add coupons, their rewards cards, in the stores, and there was no testimony in the record below that that was a service that was only available on the website and not available to people in the stores. I thought that Mr. Gill said that he had to ask store employees for help with the coupons and that they were not accommodating, something like that. Is that incorrect? No, I believe his testimony, I mean, he was a customer for 16 years and said he used coupons and did all the things. I believe his testimony was that when he would go into the stores, he sometimes would ask for help of reading signs, and that he said that they always helped them, but that sometimes they appeared to be annoyed at his request. But he never said that he was ever denied any service in the store. Let me ask you one other point of clarification, because I want to make sure I understand. Did Winn-Dixie raise any issue in the district court about compliance with the injunction or the application of the WCAG 2.0 standard? Yes, absolutely. I mean, that was one of the central things. Probably, if you looked at my closing argument, that was one of the big issues, you know, and one that's up here on appeal about the fact that WCAG is not law. And Mr. Kerouac, the plaintiff's expert, testified that there was, he'd never found a website that was 100% in compliance with the standards. Another point, WCAG is not the only standard out there. You know, they've said that we failed because we didn't propose an alternative, but that's not my job, and it's not the court's job to come up with the technical standards that are going to govern websites. And the fact that WCAG is constantly changing, that a business could never be in 100% compliance with the standard, is precisely why the court should not be establishing it as a legal standard. Because even saying, Winn-Dixie, you need to comply with WCAG 2.0, there's still not any specificity for us as to exactly what that means. You know, if we only comply with, if we manage to meet 80% of WCAG, is that enough? Is that going to save us from being hauled back into court in contempt when WCAG gets updated? You know, does that mean we have to change the standard then? What if the court had simply said, as Mr. Furliger suggested, you shall comply, you shall make your website accessible to the visually impaired? I think I would go back. It's vague. It's still, there's no definite standard, which is why the court should not be stepping in and trying to legislate and fix this problem from the bench. This is best left to Congress and the executive agencies to come up with the statutes and the regulations to clarify this issue. Just because there is a void does not mean it's the court's place to step in and fill that void. I think the record in this case demonstrates exactly why that is, because there are different standards. As they testified, screen reader software is an end-user solution, except for an end-user, as a disabled person's experience in going to a website is going to vary between what type of screen reader software they're using,  what operating system they're using. They will say, well, that's why we have these kind of general standards, because it's sort of a one-size-fits-all guidelines to try and cover all the bases. But even, you know, we could have a situation where when Dixie tries to comply with WCAG 2.0, does everything 100% correct, and yet someone else comes along and says, well, I can't access the website because it's not working with my program and my screen reader software. Therefore, now I have another cause of action because your website's not accessible. And but going back to the issue in this case, which is having to do with the accessibility, it's not about the website. The website is not... It was not alleged in this case that the website was a service, that the website was a good. It was alleged. It was agreed to in the pretrial stipulation. It was what was litigated was whether the website is a place of public accommodation. And as I've said before, it is not. It cannot be under the statute, under the 11th Circuit precedent. And then the question becomes, was Mr. Gill provided equal access to the goods and benefits of Winn-Dixie, which are found in the stores? And he was. He testified. He was a 16-year customer. And he availed himself fully of all the goods and services, benefits and privileges of Winn-Dixie. What he's alleging now is I can't get on the website. I want access to the website. Not I can't get my prescriptions because I can't get on the website. Not I can't use coupons anymore because I can't get on the website. In fact, he testified to quite the opposite. Were there any goods or services provided through the website portal for prescriptions that he could not attain at the store? No. No. Actually, the only thing... Coupons are available. All prescription services are available. Yeah, the only way you can use the prescription services, which actually is not even a site. I mean, that's an issue we haven't even gotten to. That's a third-party site that's not owned by Winn-Dixie, which is once a customer has a prescription at Winn-Dixie, they can then manage that prescription through the PDX website, which is a microsite. But to have the prescription, they first need to either have their doctor call it in or bring it in themselves, and then they have to go and pick it up in the store. There's no delivery services or anything like that. As I understand it, they can order refills on the website, but then they still have to go into the store to get the refill. Correct. Correct. But you could also call into the store. You could have your doctor call in. There's other ways. It's not the only way one gets a refill. I think I'm concluding the law here is clear that websites are not places of public accommodation, and the trial court erred in kind of skirting that issue and determining at the very end, after it wasn't alleged that the website was a service. WCAG 2.0 is not law. The court should not be stepping in and creating technical standards. That is best left to Congress and DOJ. They may have failed to act, but that's still, it's their job to step in and provide clarity on this issue. And I would just ask that the court reverse and enter judgment in favor of Wood-Dixie. Thank you.